Rogers v. Wheeler.

New trial denied.

JAMES ROGERS AND JOHN ROGERS, Respondents, *v.* WILLIAM A. WHEELER et al., Appellants.

(GENERAL TERM, THIRD DEPARTMENT, JUNE, 1872.)

The defendants were common carriers, and also had, at one terminus of their route, an elevator through which they received merchandise for transportation, and which they also used as a warehouse for storage; having received at the elevator from a connecting carrier the plaintiffs' grain, consigned to a point beyond the other terminus of their line, without directions or agreement for its storage,—*Held*, that they were liable to the plaintiffs as common carriers and not as warehousemen.

A practice of plaintiffs to bag grain, shipped to them over defendants' line, at the elevator as a matter of convenience, not founded on any understanding or agreement between plaintiffs and defendants, held not to affect the defendants' liability as common carriers.

Letters of the plaintiffs sent to the defendants in regard to a former shipment of grain, directing the forwarding of part of such shipment, and containing no directions as to the residue, construed, and held not to show an understanding that the grain in question should be held in store for orders.

Nor does the evidence of an agent of the defendants, that the defendants' grain was stored until ordered forward, and that in storing it he acted as agent for plaintiffs, the only authority for so acting being derived from

Rogers *v.* Wheeler.

the bills of lading, by which the grain was consigned to the plaintiffs at its destination under the care of such agent at the elevator.

Where the only tendency of certain incompetent testimony was to establish a fact which the referee expressly negatived by his findings of fact, *Held,* that there was no error for which the decision could be disturbed.

The consignment to care of " A B, agent," it appearing that he was agent only for the defendants, and solely in their employ, was a consignment in effect to the defendants. And that the defendants had previously received and carried the plaintiffs' goods similarly consigned is evidence of an understanding by defendants that it was to their agent for their benefit.

APPEAL from judgment recovered on referee's report.

*Edward C. James,* for the appellants.

*Matthew Hale,* for the respondents.

Present—POTTER, P. J.; PARKER and DANIELS, JJ.

DANIELS, J.   This action was brought to recover the value of a quantity of grain destroyed by fire while it was in an elevator, situated at Ogdensburgh.   The defendants, at that time and previous thereto, had the possession and use of the elevator, together with the railroad of the Northern Railroad Company, as trustees for the second mortgage bondholders of the Northern Railroad Company.   Before and at the time of the fire this elevator was used and employed by the defendants for the purpose of elevating grain into it, storing it there for the owners, and also for the defendants themselves, where it was received, there to be transported by them over the Northern railroad.   In their capacity of trustees, they carried on the business of warehousemen at the elevator, and also that of common carriers over the railroad they had in their possession.   The grain received from the lake for transportation over the road by the defendants as common carriers was so received at the elevator, and afterward delivered from there on the cars used by the defendants in operating and carrying on the business of the railroad.   This road extended from Ogdensburgh to Rouse's Point; and it was used by the defendants between those places in the carriage and trans-

Rogers *v.* Wheeler.

portation of passengers and property for hire as common carriers.

After the grain in question was received into the elevator it was destroyed by an accidental fire, which did not appear to have been caused by any fault or negligence of the defendants, and which consumed the elevator and its contents. The grain belonging to the plaintiffs, which was so destroyed, was in part received into the elevator on the seventh day of July, 1864, and in part on the twenty-seventh day of the same month; and the fire destroying it occurred on the next day. This grain was shipped partly from Chicago, and the residue from Milwaukie, by propeller, in the Northern Transportation Company, to be carried from those points by that line to Ogdensburgh. By the terms of the bills of lading, made use of in the shipment of the grain, that company was exonerated from liability arising out of loss of the grain by fire. But these bills of lading governed the transit of the property only between the points of shipment and the termination of the route by water. They declared and defined the obligations of the Northern Transportation Company from the time the property was received by it until it was properly delivered at Ogdensburgh, and no longer. (*Lamb* v. *Camden and Amboy R. R. Co.*, 46 N. Y., 271.) After that the obligations of the carrier were left to be inferred from the circumstances indicating the course and ultimate destination of the property. The case is not, therefore, within the principle held and applied in *Maghee* v. *Camden and Amboy R. R. Co.* (45 N. Y., 514), where the contract made by the carrier receiving the property extended over the portion of the route of transit upon which it was accidentally destroyed.

Upon the trial of this cause it appeared that the property in controversy was designed by the plaintiffs to be carried and transported from the points of its receipt to Ausable Forks, where they were engaged in carrying on business. Its route from Ogdensburgh was by the Northern railroad to Rouse's Point; from thence by boats to Port Kent, upon

Rogers *v.* Wheeler.

Lake Champlain; and thence by teamsters to the plaintiffs' place of business. The defendants' obligations concerning the property commenced upon its receipt at the elevator, and terminated with its delivery at Rouse's Point. The agents of the Northern Transportation Company, at Chicago and Milwaukie, had authority to contract at the usual rates for the transportation of property carried by that company over the defendants' road; but, as has been already observed, they made no such contract concerning that which is now the subject of controversy. The contract made by those agents on behalf of that company, by means of the bills of lading given in evidence, extended no farther than Ogdensburgh. There, according to these bills of lading, the grain was consigned to D. C. Brown, agent, and directed to the plaintiffs, at Ausable Forks. The precise terms made use of upon that subject in the margin of the bills, and after binding the Northern Transportation Company to carry it to Ogdensburgh, was as follows: "I. and I. Rogers, Ausable Forks, N. Y. Care D. C. Brown, agent, Ogdensburgh, N. Y." And it is from that, in view of the evidence given concerning the agency of D. C. Brown, the receipt of the property by the elevator, with notice of its destination to the person in charge of it, and the actual destination of the property, that the defendants' obligation concerning it is to be inferred. For the evidence, given by one of the plaintiffs as a witness upon the trial, showing that they always bagged their grain at Rouse's Point, and preferred to do so, did not restrict the defendants to its carriage in such quantities as would allow that to be done; for no orders were ever given by the plaintiffs to that effect. Even the practice itself was qualified by the circumstance that it was only bagged when it did not arrive too fast to permit that to be done, and could be received in that way fast enough to suit the management of the railroad. This was simply a convenience to the plaintiffs, imposing no obligation upon the defendants to so keep and forward the grain as to secure its enjoyment by the owners of the property. No contract or understanding can properly be inferred from

this circumstance that the defendants should store the grain in the elevator, either in whole or in part, for such a period of time, and send it over their road in such quantities merely as would secure or promote the enjoyment of that privilege or practice by the plaintiffs. Neither the agents of the defendants nor any other person gave any evidence tending to show that the plaintiffs had indicated any desire to have their grain forwarded in that manner; and no contract to do so can be implied from the isolated circumstance mentioned by this plaintiff in his testimony. More particularly must that be the case in view of the evidence given by the agent, D. C. Brown, who swore that he never had any directions at all from the plaintiffs in regard to the grain; but merely knew of their manner of receiving it at Rouse's Point, which was to put men in the cars to bag it; that he had no agreement with them for its storage; that no charges were made for its storage; and he ordered it to be sent forward as fast as suitable cars could be had, which was not, on an average, faster than one car load per day. From his evidence it is to be inferred that it was delayed at the elevator for want of cars; and not because it was designed to forward it only so fast as it could be conveniently bagged by the plaintiffs upon its arrival at Rouse's Point. The witness testified further, that he never had any interview with the plaintiffs prior to the fire; and, consequently, he could have had no express verbal directions concerning the manner in which the grain was to be carried and delivered by the defendants; and no other direction whatever was pretended, except so far as the letters produced contained instructions upon that subject. Two of these letters were proved in the case, which were written before the fire; one to Brown, requesting that he would send forward two car loads of wheat as soon as it arrived; and the other to Parker, saying, "if it has not come forward, will you send two or three cars at once?" These letters related to a previous cargo of 2,500 bushels shipped, carried to Ogdensburgh, and received at the same elevator there, in the same manner as the wheat in controversy; and they were

Rogers *v.* Wheeler.

introduced as indicating an understanding that the grain was to be retained in store at the elevator until ordered forward by the plaintiffs. But they countenance no such conclusion. The first one urged Brown to send forward two car loads as soon as it arrived, giving no directions whatsoever as to the remainder of the cargo; but adding, "we are in great want of it;" "send it to Rouse's Point." By this term "it," they evidently meant to refer to the entire cargo of 2,500 bushels, previously mentioned in the letter. And it was fairly to be so understood. As so construed, it informed the agent, Brown, that the plaintiffs were in great want of the entire cargo; and desired at least two car loads as soon as it arrived. This conferred no authority to retain any portion of it; but simply urged the transportation of a part at once. And it was probably written in this manner by reason of the fact mentioned by the plaintiff, who was called upon the stand as a witness by the defendants, that the plaintiffs understood that there was a deficiency of cars to do the defendants' business; and that it had been so for several years prior to the fire. The other letter, written five days afterward to Parker, relating to the same cargo, certainly affords no ground for supposing the existence of an understanding to detain the grain until the plaintiffs ordered it forward; for it implied an obligation to send it forward without specific directions. By the terms of that letter the defendants were requested (being written to Parker), if it was a request to them at all, to send the two or three car loads at once, if the cargo itself had not then gone forward; and as no particular directions were given to send the entire cargo by the previous letter, and no express agreement existed upon the subject, according to the testimony of Brown, and the plaintiff, sworn as a witness, the obligation, under which the second letter implied that the cargo might possibly have been sent on, was exclusively and necessarily one arising out of the manner in which the defendants received the grain. No authority was anywhere given to store the grain in the elevator or elsewhere by these letters, or by any directions given concerning it by

the plaintiffs. And no agreement was ever made between the parties on that subject.

It is true that Brown swore that the grain was elevated and stored until ordered forward; and that he was the plaintiffs' agent in elevating, storing and forwarding it. But this statement was entitled to no force as evidence in this case; for he afterward stated that he inferred that to be the case only from the bills of lading under which the grain was received; and they contained nothing whatever which warranted any such conclusion. This witness testified that he was never employed by the plaintiffs to act as their agent, except as the bills of lading employed him; and they created no such employment, for they contained no reference to him beyond that of consigning the grain to his care.

He was the assistant superintendent of the railroad maintained and operated by the defendants; and as he never was employed as an agent by the plaintiffs, or for them by any one acting under authority from them, and was not shown to sustain any other relation than that of assistant superintendent, either to the defendants, their railroad, or their business, or the grain in question, the conclusion follows that the consignment of it must have been made to him in that and in no other capacity. And as neither he nor the defendants had any authority to store the grain in the elevator from the plaintiffs, the question is presented whether the defendants received it solely in their character as common carriers, and are, as such, liable for its loss. Whether they did or not must be inferred from the circumstances under which it was received. For although certain instruments, sent by the agent of the Northern Transportation Company to the plaintiffs, indicating that the defendants expressly undertook to carry the grain forward, were received in evidence, upon the trial they proved no such agreement on the part of the defendants. The only evidence given attempting to connect the defendants with these instruments was the statement of the agent who issued them, that he had no doubt but that the defendants' agents had seen printed blanks, such as those sent were,

Rogers v. Wheeler.

in the office of the witness before they were filled out. This evidence was given, and the instruments referred to were read upon the trial, under the objection made by the defendants to the impropriety and incompetency of both. There can be no doubt but that the referee decided erroneously in both respects. For this was not a matter that could be proved by the opinion of a witness; and if it had been it did not prove enough to subject the defendants to anything stated in the instruments read. If the judgment, or any of the referee's conclusions against the defendants, were based upon the evidence so erroneously received, it would necessarily follow that a new trial should be ordered on this account. But that is not the case. For, so far as this evidence tended to prove anything, it was an express agreement for the carriage and transportation of the grain, while the referee, in his twenty-first finding, has found as a fact that the defendants made no express contract with the plaintiffs to carry the grain. And as long as that was his conclusion it is clear that this improper evidence could do the defendants no harm, although he found from it that the defendants knew of the existence of those blanks. For that finding, erroneous as it no doubt is, since it was only supported by improper evidence, in no way contributed to the conclusion finally reached. That was made to depend upon the circumstances which were legally and fully proved by the evidence in the case; and if they necessarily lead to that result, no injury was sustained by the evidence improperly received.

By the uncontroverted facts proved upon the trial it was shown that all grain consigned to Ogdensburgh, going over the railroad, necessarily went through this elevator; and as Brown, by the evidence in the case, was shown to sustain the relation of agent only to the defendants, in whose sole employment he appears to have been, the consignment of the grain to him as agent was a consignment, in effect, to the defendants. That it was so understood on the plaintiffs' part was clearly made to appear; and that the defendants received it in the same way, and with the same understanding, is as

little open to doubt. For it was received as other grain, in the same way consigned, before it had been received at the defendants' elevator by the person in charge of that establishment, who issued receipts for part of it in the course of his employment. And all of the first cargo, and part of the second, was carried over the road and delivered before the fire occurred which consumed the residue. This was sufficient to show that the defendants understood that the consignment of this grain to Brown as agent was a consignment of it to them. They had done business for the plaintiffs in the same way before. The agent of the Northern Transportation Company testified that after removing the rolling freight from the boat, she was sent to the elevator to discharge her grain; that then, or before, an abstract was made of her manifest, and a copy of what freight was to go east; and a copy of that was delivered to the railroad agent. That, he said, was done in this instance. He added further: " I sent a memorandum of amount of grain to Bosworth, the railroad man at the elevator, with consignee's names." From that, the receipts given for a portion of the grain, the consignment made of it by the bills of lading, the receipt of it by the defendants, and the business in which they were engaged, the referee found that the defendants received the grain in their capacity of carriers, and not in that of warehousemen; and, as there was no agreement or understanding existing for the storage of the grain in the elevator, it follows, from the circumstances proved, that his conclusion in this respect was fully warranted by the evidence in the case. The delivery to, and the receipt by, the elevator was a mere accessory to the obligation to carry, which was clearly to be implied from the circumstances proven. It was the only mode in which the defendants received that description of property for the purpose of carrying it; and as this was ultimately consigned over and beyond the terminus of the defendants' road, and was received subject to that direction accompanying the property, while it remained in their hands they held it as common carriers, responsible for the consequences resulting to it

Rogers *v.* Wheeler.

from an accidental fire. This liability is so fully sustained by the authorities that nothing beyond a simple reference to them can be required to maintain the conclusion mentioned. (*Blossom* v. *Griffith*, 3 Kernan, 569; *Miller* v. *Steam Navigation Co.*, 10 N. Y., 431; *Goold* v. *Chapin*, 20 id., 259; *Ladue* v. *Griffith*, 25 id., 364; *Fenner* v. *Buffalo and State Line R. R. Co.*, 44 id., 505; *Witbeck* v. *Holland*, 45 id., 13.) This conclusion does not conflict with that which was declared in *Banou* v. *Eldridge* (100 Mass., 455), upon another claim, arising out of the destruction of other property in the same elevator at the time of the fire. For that property, it was held, was not in the possession of the defendants as carriers. What the evidence was which was given upon that subject does not appear in the report of the case; and for that reason it cannot be deemed an authority against the defendants' liability on the present demand.

In this case it is to be inferred, from the manner in which the defendants received the property, with knowledge of its consignment over and beyond the terminus of their road, that they received it for the sole purpose of being carried and not stored by them; and, consequently, that they became liable for its loss by the fire which destroyed it. As the circumstances proved led to this conclusion, the referee properly refused to find the other facts claimed to have been sustained by the evidence. They were inconsistent with the established liability of the defendants, and, for that reason, not only not proved, but actually negatived by the result maintained in the referee's report.

The judgment should be affirmed, with costs.